**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IPSEN BIOPHARMACEUTICALS, INC.,<br>1 Main Street<br>Cambridge, MA 02142,<br><br>            Plaintiff,<br><br>      v.<br><br>ALEX AZAR II, in his official capacity as<br>SECRETARY OF HEALTH AND HUMAN<br>SERVICES,  200 Independence Avenue, S.W.<br>Washington, DC 20201,<br><br>and<br><br>STEPHEN M. HAHN, M.D.,<br>in his official capacity as<br>COMMISSIONER OF FOOD AND DRUGS,<br>FOOD AND DRUG ADMINISTRATION,<br>10903 New Hampshire Avenue,<br>Silver Spring, MD 20993,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**

Plaintiff Ipsen Biopharmaceuticals, Inc. (Ipsen) hereby brings this Complaint against

Defendants Alex Azar II, solely in his official capacity as Secretary of the Department of Health and

Human Services (HHS), and Stephen M. Hahn, M.D., solely in his official capacity as Commissioner

of Food and Drugs, head of the Food and Drug Administration (FDA or the agency), and alleges as

follows:

1.      This is an action to set aside FDA's unlawful refusal to regulate Ipsen's product

Somatuline® Depot (lanreotide acetate) for subcutaneous injection as a "biological product" under the

new definition of that term, as set forth in both the agency's governing statute and its binding regulations.

2.     Congress directed FDA to transition over to regulation as a "biological product" (or biologic, for short) any previously approved drug products that meet a new statutory definition of that term, setting a statutory deadline of March 23, 2020 for that transition.  Under the new statutory definition, a "biological product" includes any "protein," without qualification.  And under recent FDA regulations, the term "protein" means "any alpha amino acid polymer with a specific defined sequence that is greater than 40 amino acids in size."  FDA's definition expressly recognized that the amino acid polymer of a protein can be comprised of two or more amino acid chains, each containing 40 or fewer amino acids, provided the chains are "associated with each other in a manner that occurs in nature."

3.     The active ingredient in Somatuline Depot falls squarely within that definition:  It is an amino acid polymer with a specific defined sequence composed of multiple amino acid chains associated with each other in a manner found in nature, where the total number of amino acids among the associated chains exceeds 40 amino acids.

4.     Nonetheless, FDA refused to include Somatuline Depot in the list of products that it transitioned over to regulation as a biologic on March 23, 2020, as required by statute.

5.     Ipsen requested that FDA reconsider its decision, and set up a telephonic meeting with the agency's Office of Chief Counsel on April 30 to explain its position.  Following the meeting, Ipsen provided written answers to questions posed by FDA.  On July 31, FDA refused Ipsen's request, reaffirming its position that Somatuline Depot is not a biological product.

6.     FDA's refusal to recognize Somatuline Depot as a biological product is unlawful.  FDA's treatment of Somatuline Depot violates the agency's statutory command and its own regulations.  It is

also arbitrary and capricious because it defies logic, ignores clear evidence in front of the agency, and is inconsistent with the agency's treatment of similarly situated entities.  For all of these reasons, FDA's decision violates the Administrative Procedure Act (APA).

## PARTIES

7.     Plaintiff Ipsen is a Delaware company with its principal place of business at 1 Main Street, Cambridge, MA 02142.  Ipsen manufactures, markets, and sells pharmaceutical products, most principally Somatuline Depot.

8.     Defendant Alex Azar II is the Secretary of HHS and is responsible for administering and enforcing the Food, Drug, and Cosmetic Act, 21 U.S.C. § 321, *et seq*.  Defendant Azar is being sued in his official capacity only.  Defendant Azar maintains an office at 200 Independence Avenue, S.W., Washington, D.C. 20201.

9.     Defendant Stephen M. Hahn, M.D., is the Commissioner of Food and Drugs and is responsible for supervising the activities of FDA, an administrative agency within HHS.  Defendant Hahn is being sued in his official capacity only.  Defendant Hahn maintains offices at 10903 New Hampshire Avenue, Silver Spring, MD 20993.

## JURISDICTION AND VENUE

10.     Jurisdiction in this Court is grounded upon and proper under 28 U.S.C. § 1331 (federal question), in that this is a civil action arising under the laws of the United States; 28 U.S.C. § 1346, in that this case involves claims against the federal government; 5 U.S.C. § 702, in that Ipsen is seeking judicial review of an agency action from which it has suffered a legal wrong, has been adversely affected, and has been aggrieved; 28 U.S.C. § 1361, in that this is an action to compel an officer of the United States to perform his duty; 28 U.S.C. §§ 2201–2202, in that there exists between Ipsen and the Defendants an actual, justiciable controversy as to which Ipsen requires a declaration of its rights by

3

this Court as well as injunctive relief to prohibit the Defendants from violating laws and regulations; and 21 U.S.C. § 355(q) and other sources of law, in that the conduct complained of constitutes final agency action.

11.    Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (e) because this is a civil action in which the Defendants are officers of the United States acting in their official capacities and one of the Defendants maintains his office and conducts business in this judicial district.  Moreover, a substantial part of the events giving rise to the claims herein occurred within this judicial district.

12.    Ipsen has standing to bring the present lawsuit because it is suffering and faces additional actual injury as a result of FDA's decisions and because it is within the zone of interest of the relevant statutory and regulatory provisions.

## FACTUAL BACKGROUND

### I.   Statutory Background

13.    The Federal Food, Drug, and Cosmetic Act (FDCA) provides the statutory framework for FDA's regulatory oversight of drug products.  Brand name manufacturers seeking permission to market an "innovator" drug can submit a full New Drug Application (NDA) under Section 505(b)(1) of the FDCA.  21 U.S.C. § 355(b)(1).  A full NDA is a comprehensive application that contains reports of well-controlled scientific studies conducted by or for the applicant, demonstrating that the drug is safe and effective.

14.    After a period of marketing exclusivity and expiration of any applicable patent rights, FDA may approve applications to market generic versions of the innovator drug, so long as they meet the criteria for approval.  Generic drugs are approved through an Abbreviated New Drug Application (ANDA) under Section 505(j) of the FDCA.  21 U.S.C. § 355(j).  ANDAs generally do not include new clinical data.  Instead, an ANDA relies on FDA's finding of safety and efficacy for a previously

approved drug, which is known as the "reference listed drug."  In other words, the point of an ANDA is not to demonstrate safety or effectiveness directly, but to establish that the generic product is equivalent to a reference listed drug already known to be safe and effective.  *See* 21 U.S.C. § 355(j)(2).

15.    The process is slightly different for *biologics*—products like blood, viruses, and proteins. While biological products still qualify as "drugs" under the FDCA, they are subject to special additional regulatory requirements.  Under the Public Health Service Act (PHS Act), companies wishing to market a biological product submit a biologic license application (BLA) to FDA.  FDA approves a BLA when it determines that the product, the manufacturing process, and the manufacturing facilities meet applicable requirements to ensure that the product is "safe, pure, and potent."  42 U.S.C. § 262(a)(2)(C)(i).

16.    On March 23, 2010, Congress enacted the Biologics Price Competition and Innovation Act of 2009 (BPCI Act), which created an abbreviated approval pathway for biological products that are demonstrated to be either (i) "biosimilar" to or (ii) "interchangeable" with an FDA-approved biologic.  42 U.S.C. §§ 262(i)(2), (4).  A biological product is "biosimilar" to the reference product when it is "highly similar" to the reference product and when there are no clinically meaningful differences between the biological product and the reference product in terms of safety, purity and potency.  *Id.* § 262(i)(2).  In order to meet the higher standard of "interchangeability," a sponsor must demonstrate that the product is both biosimilar to the referenced product *and* can be expected to produce the same clinical result as the reference product in any given patient (and, for a biological product that is administered more than once, that the risk of alternating or switching between use of the biosimilar product and the reference product is not greater than the risk of maintaining the patient on the reference product).  *Id.* § 262(i)(4).

17.    Until recently, the PHS Act defined the term "biological product" to mean "a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, ***protein (except any chemically synthesized polypeptide)***, or analogous product . . . applicable to the prevention, treatment, or cure of a disease or condition of human beings."  42 U.S.C. § 262(i)(1), eff. Mar. 23, 2010 (emphasis added).

18.    In late December 2019, Congress amended that definition to remove the exception for chemically synthesized polypeptides.  The definition now reads:  "a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, ***protein*** ~~*(except any chemically synthesized polypeptide)*~~, or analogous product . . . ."  *Id.* (eff. Dec. 20, 2019).

19.    As a result, the statutory definition of "biological product" now includes *any* "protein," including those that are manufactured through synthetic systems.  *Id.*

20.    The BPCI Act also provided that on March 23, 2020—ten years after enactment—an approved drug application for a drug product that meets the definition of "biological product" shall be "deemed to be a license" for the biological product.  BPCI Act, Section 7002(e)(4) ("An approved application for a biological product under section 505 of the [FDCA] shall be deemed to be a license for the biological product under such section 351 on the date that is 10 years after the date of enactment of this Act.").   In other words, drug products meeting the definition of "biologic" were statutorily transitioned over to biologics as of that date.

## II.    FDA's Rulemaking to Define "Protein"

21.    Shortly after the statutory definition was amended, FDA finalized a previously proposed rule defining the statutory word "protein."  85 Fed. Reg. 10,057 (Feb. 21, 2020).  The rulemaking had been initiated a year before the statutory amendment.  In the Proposed Rule, FDA had stated: "To enhance regulatory clarity and minimize administrative complexity, FDA is proposing to codify an

approach that distinguishes proteins from peptides based solely on size (i.e., number of amino acids)." 83 Fed. Reg. 63,817, 63,821 (Dec. 12, 2018).  FDA defined the term "protein" to mean "any alpha amino acid polymer with a specific defined sequence that is greater than 40 amino acids in size."  *Id*.

22.    But the definition did not leave off there.  It also recognized that the amino acid polymer of a protein can be comprised of two or more amino acid chains that are associated with each other. *Id*. at 63,821.  Notably, FDA did not require that this association take the form of a covalent bond in order to form the requisite association, as it has in other contexts.  *See, e.g.*, 21 C.F.R. § 314.3(b) (definition of "active moiety").

23.    Instead, FDA proposed what it called a "bright line" test for determining whether a product formed by associated amino acid chains meets the definition of "protein."  FDA noted that the association between amino acid chains can be in a manner that occurs in nature, or in a manner that is not found in nature.  Only the former is relevant here.

24.    For products associated in a manner that *occurs in nature*, FDA explained:

When two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the amino acid polymer would be based on the total number of amino acids in those chains, and would not be limited to the number of amino acids in a contiguous sequence.  In other words, the amino acids in each such amino acid chain would be added together to determine whether the product meets the numerical threshold in FDA's interpretation of the term 'protein' . . . .

83 Fed. Reg. at 63,821.

25.    In the Final Rule, FDA acknowledged the recent statutory amendment and proceeded to implement the definition of "protein" set forth in the Proposed Rule.  As a result, FDA's regulations now state:

A protein is any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size. When two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the amino acid polymer for purposes of this paragraph (h)(6) will be based on the total

7

number of amino acids in those chains, and will not be limited to the number of amino acids in a contiguous sequence.

21 C.F.R. § 600.3(6).

26.    FDA explained that its new test provides a "bright-line" approach that "will allow both FDA and private industry to avoid spending time and resources on case-by-case determinations for each product."  85 Fed. Reg. at 10,057.

27.    In finalizing the rule, FDA rejected the argument made by a commenter that insulin would not count as a protein under the new definition, because it is composed of two amino acid chain subunits—one containing 21 amino acids and the other containing 30 amino acids.  *Id*. at 10,060. FDA pointed out that because "these amino acid chain subunits are associated with each other in a manner that occurs in nature, we add the number of amino acids in each amino acid chain together to determine whether insulin is an alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size."  *Id.*

28.    FDA also rejected another commenter's request that the agency define those products that are "analogous" to a protein.  *Id.* at 10,061.  However, the agency asserted that "it would not be appropriate for the statutory term 'analogous product' to be interpreted in a way that would include products that are specifically excluded by this final rule."  *Id.*

29.    Throughout the rulemaking, FDA made clear that the frame of reference for analyzing whether a product meets that requirement is the active ingredient as it exists in the finished dosage form of the product—in this case, the pre-filled syringe containing the active ingredient to be injected into the patient.  In the preamble to the Proposed Rule, FDA explained that the associated amino acid chains "would be added together to determine whether *the product* meets the numerical threshold."  83 Fed. Reg. at 63,821 (emphasis added).  The term "product" for FDA regulatory purposes generally

8

refers to the active ingredient or active substance as it exists in a finished dosage form.  *See, e.g.,* 21

C.F.R. § 314.3 (defining "drug product" as "a finished dosage form, e.g., tablet, capsule, or solution,

that contains a drug substance, generally, but not necessarily, in association with one or more other

ingredients").

30.    FDA recently updated its list of biological products to be transitioned to BLAs on March

23, 2020, as required by Congress.  That list—referenced herein as the "List of Transitioned

Products"—contained 97 products that FDA believed to qualify for treatment as a biologic.  *See*

https://www.fda.gov/media/119229/download.  Somatuline Depot was not among them.

### III.    Ipsen's Somatuline Depot

31.    Somatuline Depot is approved for treating several rare diseases through extended-release

dosing of lanreotide acetate, a synthetic peptide molecule that mimics the naturally occurring hormone

somatostatin.  *See* Somatuline Depot Package Insert, Section 11.[1]  FDA initially approved Somatuline

Depot in 2007.  It is currently indicated for the treatment of patients suffering from acromegaly, a

production of excess growth hormone (GH) by the pituitary gland, to treat adult patients with specific

types of tumors in the gastrointestinal tract, and to help ease symptoms caused by carcinoid syndrome.

*Id.*, Section 1.2, 1.3.

32.    Somatuline Depot is a product that contains a viscous, gel-like substance comprised of

lanreotide acetate chains organized into large, tubular structures called nanotubes.  These nanotubes

have significantly more than 40 amino acids.  Somatuline Depot is marketed as a supersaturated

solution of the active ingredient and water in a semi-solid phase for injection under the skin.

---

[1] *Available at* https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/022074s024lbl.pdf
(*Package Insert*).

33.    Somatuline Depot falls squarely within the definition of "biological product" as reflected in the amended statute and in FDA's implementing regulation.  As noted above, the statute provides that all proteins—even chemically synthesized ones—count as biological products.  42 U.S.C. § 262(i)(1).  And FDA has defined the statutory term "protein" to mean "any alpha amino acid polymer with a specific defined sequence that is greater than 40 amino acids in size."  85 Fed. Reg. at 10,057.  FDA's definition recognizes that the underlying amino acid polymer of a protein can be comprised of two or more amino acid chains associated with each other in a manner that is found in nature.  83 Fed. Reg. at 63,821.

34.    And that is precisely what Somatuline Depot is: an amino acid polymer with a specific defined sequence composed of multiple amino acid chains where the total number of amino acids exceeds 40 amino acids.  The amino acid chains in Somatuline Depot also associate with each other in a manner that occurs in nature.  The interactions between amino acid chains in Somatuline Depot involve the same chemistry and ordering that drives the association of amino acid chains in nature and that governs the assembly of proteins in biological systems.  In natural proteins, the amino acid chains self-assemble into three dimensional shapes, driven by primary amino acid sequence.  So too with Somatuline Depot, wherein the amino acid chains form a nanotube through the same chemistry and thermodynamic ordering as found in nature.

35.    At the very least, Somatuline Depot is "analogous" to a protein, both for the reasons set forth above, and because it has the size, structure and complexity to be considered analogous to a protein.  Somatuline Depot thus is entitled to treatment as a biologic.

IV.    **FDA's Refusal to Recognize Somatuline Depot as a Biologic**

36.    Nonetheless, when FDA updated its preliminary List of Transition Products on December 31, 2019 to reflect the new statutory definition, Somatuline Depot was not on the list.

37.    On February 19, 2020, Ipsen wrote to FDA requesting the prompt addition of Somatuline Depot to the List of Transition Products.  In its comment letter, Ipsen explained that Somatuline Depot falls squarely within the updated definition of "protein" set forth in the Final Rule.

38.    On March 10, 2020, following promulgation of the Final Rule, Ipsen submitted supplemental comments to FDA reiterating its request for treatment as a biological product under the new definitions, and attaching an expert declaration explaining why its product met the new definition.

39.    On the statutory deadline, March 23, 2020, FDA removed a number of products that it deemed to be "biological products" under the new statutory definition from the "Orange Book," the agency's official listing of FDA-approved drug products.  FDA indicated that it was moving these products over to the "Purple Book," the official listing of biological products that have been licensed by FDA.  *See* https://www.accessdata.fda.gov/scripts/cder/ob/index.cfm.

40.    On March 24, 2020, FDA finalized its List of Transition Products.  *See* https://www.fda.gov/media/119229/download.

41.    Somatuline Depot was neither listed on the final List of Transition Products nor moved to the Purple Book.  Instead, Somatuline Depot remains listed in the Orange Book, which purports to list drug products that do not constitute biological products.

42.    In an April 16, 2020 letter to the agency's Office of Chief Counsel, Ipsen requested a telephonic meeting with FDA, which was held on April 30.  On that call, Ipsen and its expert walked FDA through its regulatory and legal arguments.  On May 6, FDA provided Ipsen with a set of written questions, to which Ipsen provided detailed responses several weeks later.

43.    On July 31, 2020, FDA denied Ipsen's request.  First, the agency refused to assess the lanreotide acetate polymer in Somatuline Depot in the form it appears in the finished dosage form. Instead the agency maintained that it would examine the "released lanreotide octapeptide" *in the body*,

11

following administration of the drug, to determine whether it satisfied the definition of a "protein." FDA Letter dated July 31 at 6.  In doing so, FDA ignored the plain language of the statute and regulations, as well as a long line of its own precedent, which make clear that the finished dosage form of a drug is what matters for this type of analysis.  *See* 83 Fed. Reg. at 63,821 (explaining that the associated amino acid chains "would be added together to determine whether *the product* meets the numerical threshold.") (emphasis added); *see also, e.g.*, 21 C.F.R. § 314.3 (defining "drug product" as "a finished dosage form, e.g., tablet, capsule, or solution, that contains a drug substance, generally, but not necessarily, in association with one or more other ingredients").

44.    FDA also concluded that the amino acid chains in Somatuline Depot are not "associated with each other in a manner found in nature."  FDA Letter dated July 31 at 8–12.  Notably, FDA did not contest Ipsen's characterization of the manner in which the amino acid chains in Somatuline Depot associate with each other.  Instead, the agency applied a structural and functional test that it had expressly rejected in promulgating the Final Rule.  *Id.*

45.    Finally, FDA refused to consider whether Somatuline Depot was analogous to a protein, because according to the agency, products that fail to satisfy the "bright line" test in the rule are automatically excluded from being deemed "analogous to" a protein.  *Id.* at 14–15.  That faulty position essentially reads the "analogous to a protein" language right out of the statute.

## IV. FDA's Conduct is Unlawful, Arbitrary and Capricious

46.    FDA's refusal to recognize Somatuline Depot as a biologic violates its own statute and regulations.  Somatuline Depot falls squarely within the definition of "protein" set forth in the statute and Final Rule.

47.    The Final Rule sets forth a bright line test.  For amino acid chains that associate in a manner that occurs in nature, if (1) the amino acid polymer product contains two or more amino acid

chains, (2) the chains in the product are associated in a manner that occurs in nature, and (3) the total number of amino acids in the associated chains is in excess of 40 amino acids, then the defined sequence is not limited to the number of amino acids in a contiguous sequence.  Rather, the amino acids in the associated chains are added together to determine whether the product meets the size threshold.  83 Fed. Reg. at 63,821.

48.    For Somatuline Depot, the size of the self-assembled structures—based on the cumulative number of amino acid chains in the lanreotide acetate nanotubes—significantly exceeds the numerical threshold that FDA has adopted.  In the finished dosage form, Somatuline Depot consists of highly organized and self-assembled three-dimensional tubular arrangements consisting of thousands of repeating amino acid chains.  The amino acid chains are associated with each other via the same chemistry and thermodynamic ordering that cause amino acid chains to self-assemble in nature.

49.    FDA based its decision on its legally infirm position that the lanreotide acetate polymer in Somatuline Depot must be assessed as it appears in the body, not the finished dosage form.  FDA Letter dated July 31 at 5–8.  To reach that outcome, FDA argued that "it is the octapeptide"—the form the lanreotide acetate takes when it is "released" in the body following injection—"that confers the pharmacological activity of Somatuline Depot."  *Id.* at 6.

50.    That position is inconsistent with the language of the statute, the regulation, and the Preamble to the Proposed Rule.  The statute uses the term "product" as what must be defined and regulated, and the regulation defines the term "biological product."  42 U.S.C. § 242(i); 21 C.F.R. § 600.3(h). In the preamble to the Proposed Rule, FDA explained that the associated amino acid chains "would be added together to determine whether *the product* meets the numerical threshold."  83 Fed. Reg. at 63,821 (emphasis added).  And a "product" for FDA regulatory purposes is based on the active substance as it exists in "a finished dosage form."  *See, e.g.*, 21 C.F.R. § 314.3 (defining "drug

product" as "a finished dosage form, e.g., tablet, capsule, or solution, that contains a drug substance, generally, but not necessarily, in association with one or more other ingredients"). Indeed, it has long been the agency's position that what matters for regulatory purposes is the drug substance *as it appears in the finished dosage form*, not in the body. *See, e.g.*, Brief for Appellees at 1, *Actavis Elizabeth v. FDA*, Case No. 10-5066 (D.C. Cir. 2010). This interpretation has been recognized and endorsed by the D.C. Circuit. *See Actavis Elizabeth v. FDA*, 625 F.3d at 764-765 (D.C. Cir. 2010) (endorsing FDA's interpretation of "active ingredient" to refer to the "prodrug" form of a molecule rather than its post-ingestion form).

51.   FDA's position also is premised on its assertion that the amino acid chains in the lanreotide acetate nanotubes are not "associated with each other in a manner found in nature." FDA Letter dated July 31 at 8–12. The agency did not dispute Ipsen's characterization of the thermodynamic ordering of the amino acid chains in Somatuline Depot—i.e., the manner in which the amino acid chains associate with each other in a step-by-step folding process. The nanotubes are comprised of peptide dimer[2] building blocks, which self-assemble through noncovalent interactions between the self-organizing molecules into beta-hairpins[3] anchored by disulfide bonds.[4] That is a lot of chemistry in one sentence—but the Court need not wade into it, because FDA *does not dispute* the manner of association between the amino acid chains in the lanreotide acetate nanotubes. 85 Fed. Reg. at 10060.

52.   Instead, the agency improperly took the position that the amino acid chains in Somatuline Depot were *structurally* and *functionally* different from those in "naturally occurring proteins,"

---

[2]  A dimer is a molecule or molecular complex consisting of two identical molecules linked together.

[3]  A beta hairpin is a simple protein structural motif involving two strands that look like a hairpin.

[4]  A disulfide bond is a covalent bond between sulfur atoms that binds two peptide chains.

including the examples that Ipsen had provided in its submission.  *See* FDA Letter dated July 31 at 9

(dismissing examples of naturally occurring proteins provided by Ipsen because they involved

"multimeric *structures*"—that is, structures composed of multiple components—rather than "a single

protein"), 10 (noting that both antibodies and insulin involve amino acid chains that associate in a

"precise stoichiometry (i.e., composition and ratio of subunits) that is necessary for the *function* of the

protein.") (emphases added).

53.    In addition, FDA's attempt to dismiss these examples because they are "multimeric" (i.e.,

the amino acid polymer is formed by more than one unit), is in conflict with the Final Rule itself.

After all, that was the whole point of the rulemaking:  If two or more amino acid chains associate with

each other in a manner in which amino acid chains are known to associate in nature, the agency must

include those multiple amino acid chains in counting the amino acids—multimeric or not.  FDA

dismissed multimeric structures as "houses" and insisted that the Final Rule applies only to individual

"bricks."  *Id.* at 10.  But that is not what the Final Rule states; it mandates inclusion of the houses too.

54.    More generally, in promulgating the Final Rule, FDA expressly rejected the relevance of

structural and functional attributes.  As the agency noted in the Preamble to its Final Rule:  "FDA

considered whether to include structural or functional attributes (e.g., folding, provides structural

support to cellular macrostructures, catalyzes a biochemical reaction, transports other molecules, aids

in the folding of other proteins) in its interpretation of the term 'protein,' but determined that this

would not serve to make the line between peptides and proteins any brighter."  85 Fed. Reg. 10057-01

at 10059.  And in the Final Rule itself, FDA noted that it had "considered whether to include structural

or functional attributes in its interpretation of the word 'protein,' but determined that doing so would

not be appropriate."  *Id.* at 10060.  Instead, the agency chose to focus exclusively on whether the

amino acid chains "associate with each other in a manner found in nature."  Having excluded

consideration of structure and function in favor of a "bright-line rule that provides regulatory certainty," *id.*, FDA cannot permissibly consider structure and function in applying its definition to Somatuline Depot.

55.    FDA also took the position in its letter to Ipsen that "lanreotide nanotubes may associate similarly to amyloid fibrils and viral capsids," but nonetheless found those proteins distinguishable because "the individual subunit component of the nanotube is an 8-amino acid peptide and, as such, does not meet the definition of protein."  FDA Letter dated July 31 at 10.  But again that *ipse dixit* reads the second sentence of the regulation out of the picture entirely.  The whole point of this language in the Final Rule was to mandate that the "individual subunit components" be added together for purpose of counting amino acids if the amino acid chains associate "in a manner that occurs in nature." 21 C.F.R. 600.3(h)(6); *see* 85 Fed. Reg. at 10,057.

56.    FDA also maintains that the lanreotide acetate nanotubes are distinguishable from proteins because "they are dependent on the existence of a D-amino acid" and "while D-amino acids can occur in nature, they are rare and not a *typical* feature of the protein assemblies."  FDA Letter dated July 31 at 11 (emphasis added).[5]  FDA also asserted that the manner of self-assembly in lanreotide acetate nanotubes "differs thermodynamically from that for protein assemblies" because "protein assemblies *typically* exhibit concentration dependence, requirement for co-factors or other external elements, hysteresis, and reversibility."  *Id.* (emphasis added).  These arguments devolve into yet another structure-function assessment, rather than focusing on the "manner of association" of the amino acid chains as the Final Rule requires.  The Final Rule defines the term "protein" as "*any* alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size," 21

---

[5]   D-amino acids *are* in fact found in naturally occurring proteins, including Gramacidin A, dermorphin, and in other proteins found in humans.

C.F.R. § 600.3(h)(6) (emphasis added), not "any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size, which does not contain D-amino acids, and which exhibits concentration dependence, requirement for co-factors or other external elements, hysteresis, and reversibility." The manner of association must simply "occur[] in nature," full stop. And the particular manner in which association occurs need not be *typical* of a particular assemblage of components.

57.    FDA's position that Somatuline Depot is not "analogous" to a protein is also legal error. In declining to define products "analogous" to a protein in the Final Rule, the agency asserted that "it would not be appropriate for the statutory term 'analogous product' to be interpreted in a way that would include products that are specifically excluded by this final rule." 85 Fed. Reg. 10,061. FDA reiterated this argument in its July 31 letter, asserting that Somatuline Depot was ineligible for treatment as "analogous" to a protein because it failed the test set forth in the Final Rule. FDA Letter dated July 31 at 14–15. But if a product is covered by the Final Rule, then it is not an "analogous" product; it is a product covered by the Final Rule. *See also id.* at 15 (maintaining that a mixture *with a protein* could be analogous to a protein). The question whether a product is "analogous" only matters if the product is *excluded* by the Final Rule.

58.    The lanreotide acetate in Somatuline Depot exhibits structural properties, including self-assembly, that are found in nature, and particularly in proteins. FDA's rejection of Ipsen's arguments cannot be squared with the statute, the regulations, or the agency's other statements or past practice.

59.    In addition, the lanreotide acetate in Somatuline Depot has the size, structure and complexity to be considered analogous to a protein. As such, it is (at the very least) entitled to treatment as a biologic for that reason. FDA's decision to the contrary reads the "analogous product"

language out of its governing statute.  That is improper.  The statutory term must be given meaning, and products that are similar and comparable to proteins are entitled to treatment as analogous to them.

60.   FDA's conduct also is arbitrary and capricious, for multiple reasons.  FDA's decision defies logic, ignores evidence, and reflects a failure to engage in reasoned decisionmaking.  FDA's decision also treats similarly situated entities differently without adequate explanation.

**V.  FDA's Actions Will Cause Concrete and Imminent Harm to Patients and Ipsen**

61.   The patient population and Ipsen will be harmed unless FDA properly recognizes Somatuline Depot as a biologic.

62.   Somatuline Depot continues to be listed in the Orange Book and treated by FDA as a drug product.  As a result, FDA could approve an ANDA proposing to market a purported generic version of Somatuline Depot at any moment.

63.   Because the legal standards for approval of a biosimilar differ from those for approval of a generic drug, a purported generic drug product approved under an ANDA would be approved under the wrong standard.  Congress has specified two different approval pathways with two different sets of standards, one for drugs and one for biologics.  In addition, drugs and biologics have different frameworks governing substitution of one product for another.  A purported generic product approved under an ANDA will also receive a therapeutic equivalence recommendation, which as a matter of state law typically results in automatic substitution of the generic product for the reference product.  In contrast, purported biosimilar would still need to go through an "interchangeability" determination before it could be considered for substitution under state laws governing biologics.  Glossing over these regulatory differences would pose harm to Ipsen, patients and the public at large.  Congress intentionally created an additional layer of analysis before biosimilars may be substituted for

biologics; FDA cannot simply bypass that additional protective step by refusing to properly classify products according to their legally defined characteristics.

64.    FDA's refusal to include Somatuline Depot on the List of Transition Products and to move Somatuline Depot to the Purple Book by the statutory deadline—March 23, 2020—constitutes final agency action for which Ipsen has no other adequate remedy within the meaning of 5 U.S.C. § 704.

## COUNT I
### (Administrative Procedure Act)

65.    Ipsen realleges, reasserts, and incorporates by reference herein each of the previous allegations as though set forth fully herein.

66.    The APA prohibits FDA from implementing its statutory mandate in a manner that is unlawful, arbitrary, capricious, an abuse of discretion, or contrary to law.  5 U.S.C. § 706(2).

67.    FDA's refusal to recognize that Somatuline Depot is a biological product, and its resulting refusal to include it on the List of Transition Products or move it to the Purple Book, is unlawful and violates the governing statute and the agency's own regulations, policies, and procedures.

68.    FDA's refusal to recognize that Somatuline Depot is a biological product, and its resulting refusal to include it on the List of Transition Products or move it to the Purple Book, is arbitrary, capricious, an abuse of discretion, and contrary to law because it conflicts with the agency's own stated policies and long-standing precedent, without adequate explanation.

69.    FDA's refusal to recognize that Somatuline Depot is a biological product, and its resulting refusal to include it on the List of Transition Products or move it to the Purple Book, is

arbitrary, capricious, an abuse of discretion, and contrary to law because it reflects a failure of reasoned decisionmaking.

70.    FDA's refusal to recognize that Somatuline Depot is a biological product, and its resulting refusal to include it on the List of Transition Products or move it to the Purple Book, is not in accordance with federal law and therefore violates 5 U.S.C. § 706(2)(A).

71.    FDA's refusal to recognize that Somatuline Depot is a biological product, and its resulting refusal to include it on the List of Transition Products or move it to the Purple Book, constitutes agency action in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of 5 U.S.C. § 706(2)(C).

72.    Both Ipsen and the patient population will be irreparably harmed unless FDA is enjoined from approving any ANDAs or 505(b)(2)s that rely on Somatuline Depot as the reference drug.

73.    There is no mechanism by which Ipsen can be made whole for the injury that would result from FDA's refusal to recognize that Somatuline Depot is a biological product.  Ipsen is without an adequate remedy at law because of the unique nature of the harm it would suffer.

74.    The intent of Congress will be served by an Order enjoining FDA from continuing to refuse to recognize Somatuline Depot as a biological product.  In addition, the public interest will be served by such an Order.

### **PRAYER FOR RELIEF**

WHEREFORE, plaintiff respectfully prays for the following relief:

A.   A declaration pursuant to 28 U.S.C. § 2201 that FDA's refusal to recognize that Somatuline Depot is a biological product, and its resulting refusal to include it on the List of Transition Products or move it to the Purple Book, is unlawful, arbitrary,

capricious, an abuse of discretion, and contrary to law under the APA and the

applicable governing statutes;

B.  Preliminary and/or permanent injunctive relief requiring FDA to recognize

Somatuline Depot as a biological product;

C.  Preliminary and/or permanent injunctive relief ordering FDA to refrain from

approving any new drug applications referencing Somatuline Depot (including but

not limited to ANDAs and/or 505(b)(2) applications) pending resolution of this

lawsuit;

D.  An order awarding plaintiff's costs, expenses and attorneys fees pursuant to 28 U.S.C.

§ 2412; and

E.  Such other and further relief as the Court deems just and proper.


Respectfully submitted,


__/s/ Catherine E. Stetson_____
Catherine E. Stetson, D.C. Bar No. 453221
Susan M. Cook, D.C. Bar No. 462978
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington DC 20004-1109
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
cate.stetson@hoganlovells.com

*Attorneys for Plaintiff Ipsen Biopharmaceuticals, Inc.*

Dated:  August 31, 2020