# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

IPSEN BIOPHARMACEUTICALS, INC.,

          *Plaintiff*,

    v.

XAVIER BECERRA, Secretary, United States Department of Health and Human Services,[1] *et al.*,

          *Defendants*.

No. 20-cv-2437 (DLF)

## MEMORANDUM OPINION

Before the Court are the plaintiff's Motion for Summary Judgment, Dkt. 11, and the defendants' Cross-Motion for Summary Judgment, Dkt. 16. Because the plaintiff lacks Article III standing, the Court will grant the defendants' motion and deny the plaintiff's motion.

## I.    BACKGROUND

### A.    Legal Background

The Food, Drug, and Cosmetic Act (FDCA) prohibits introducing "any new drug" into interstate commerce without prior approval by the Food and Drug Administration (FDA). 21 U.S.C. § 355(a). For this purpose, the Act defines "drugs" to include "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals" and "articles (other than food) intended to affect the structure or any function of the body of man or other animals." *Id.* § 321(g)(1)(B)–(C). It further defines "new drug" to mean any drug whose

---

[1] When this complaint was filed, Alex Azar II was the Secretary of Health and Human Services. When Xavier Becerra became Secretary, he was substituted pursuant to Fed. R. Civ. P. 25(d).

composition "is not generally recognized . . . as safe and effective for use under the conditions prescribed, recommended, or suggested" on its labeling. *Id.* § 321(p)(1).

There are two paths through which new drugs may obtain FDA approval. First, a company may submit a new drug application (NDA) under § 505 of the FDCA. 21 U.S.C. § 355(b). The FDA may approve the application only if the company demonstrates, often through clinical trials, that its drug is safe and effective for its proposed use. *See id.* § 355(d); *see also id.* §§ 355(b)(1)(A), (d) (specifying other requirements for NDAs). In the alternative, after the FDA has approved a new drug, and after the exclusivity and patent rights of the drug's sponsor have expired, *see id.* § 355(j)(5)(B)(iv), other companies may market generic versions of that drug after the approval of an abbreviated new drug application (ANDA). *Id.* § 355(j). The FDA may approve an ANDA only upon finding that a generic drug is equivalent to the listed drug in several respects. *See id*. § 355(j)(4). In particular, the two drugs must share the same active ingredient, conditions of use, route of administration, dosage, and strength. *See id.* A generic's sponsor must also show that their product is "bioequivalent" to the listed drug, *id.* § 355(j)(4)(F), such that "the rate and extent of absorption of the [generic] do not show a significant difference from the rate and extent of absorption of the listed drug … under similar experimental conditions," *id.* § 355(j)(8)(B). Clinical trials are often unnecessary to make these showings. *See* Pl.'s Br. at 2, Dkt. 11-1. In that respect, the showing required to approve an ANDA is less demanding than that required to approve an NDA.

Different rules apply to the subset of drugs that are also biological products. The Public Health Service Act (PHSA) defines "biological product" to mean "a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein, or analogous product . . . applicable to the prevention, treatment, or cure of a disease or condition of

human beings." 42 U.S.C. § 262(i)(1).  This definition has changed over time.  Although the definition long excluded proteins that were "chemically synthesized polypeptide[s]," Congress revised it in 2019 to include all proteins, regardless of their origin.  *Compare id.* § 262(i)(1) (2012) (defining "biological product" to include "protein (except any chemically synthesized polypeptide)"), *with id.* § 262(i)(1) (2020) (defining the term to include "protein" without any carveout); Further Consolidated Appropriations Act, 2020, Pub. L. No 116-94, § 605, 133 Stat. 2534, 3127 (Dec. 20, 2019).  The FDA since promulgated a rule to define a "protein" as "any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size."  21 C.F.R. § 600.3(h)(6).

Just as the FDCA contains two pathways for approving new drugs, the PHSA contains two pathways for approving new biological products.  First, a company that seeks to market a new biological product may submit a biological license application (BLA) to the FDA.  42 U.S.C. § 262(a)(1).  The agency may approve that application upon finding that the product is "safe, pure, and potent" and that its production facility is "designed to assure" that quality.  *Id.* § 262(a)(C)(i).  The PHSA also offers an abbreviated application process: when a company seeks to market a product that is "biosimilar" to or "interchangeable" with a product that has already been approved, it may submit an abbreviated biological license application (ABLA).  *Id.* § 262(k).  For this purpose, one product is "biosimilar" to another if it is "highly similar" to that product and if "there are no clinically meaningful differences" between the products "in terms of the safety, purity, and potency."  *Id.* § 262(i)(2).  Likewise, one product is "interchangeable" with another if it is "biosimilar" to that product and if it "can be expected to produce the same clinical result . . . in any given patient."  *Id.* § 262(k)(4)(A).  The FDA may approve an ABLA upon finding sufficient evidence of either biosimilarity or interchangeability.  *Id.* § 262(k)(3).

Whether a new drug qualifies as a biological product has several implications.  First, as suggested above, the question determines whether the drug is subject to the general approval regime in § 505 of the FDCA or the more specific regime in the PHSA.  *See* 42 U.S.C. § 262(j) (providing that biological products approved under the PHSA do not also require approval under § 505).  The question also determines whether licensing a generic version of the drug requires filing an ANDA or an ABLA—and thus the legal standard the generic must satisfy.  *Compare* 21 U.S.C. § 355(j)(4) (requiring equivalence with the reference drug), *with* 42 U.S.C. § 262(k)(3) (requiring biosimilarity or interchangeability).

Recognizing the question's effects, Congress has required the FDA to reconsider its classification decisions over time.  As relevant here, the Biologics Price Competition and Innovation Act (BPCIA) provides that, beginning on August 23, 2020, any "approved application for a biological product under section 505 of the [FDCA] shall be deemed to be a license for the biological product" under the PHSA.  Pub. L. No. 111-148, § 7002(e)(4), 124 Stat. 804, 817 (Mar. 23, 2010).  In other words, the Act requires that substances meeting the definition of "biological products" be regulated as biological products, even if the FDA previously approved or regulated them as drugs.  Consistent with that Act, the FDA has published a list of biological products that, although approved pursuant to § 505 of the FDCA, it now considers to be licensed under the PHSA.  *See* FDA, *List of Approved NDAs for Biological Products That Were Deemed to be BLAs on March 23, 2020*, available at https://www.fda.gov/media/119229/download.

### B.    Factual Background

Plaintiff Ipsen Pharmaceuticals manufactures, markets, and sells a drug called Somatuline Depot.  Compl. ¶ 7, Dkt. 1.  The drug effects an "extended-release dosing of lanreotide acetate, a

synthetic peptide molecule that mimics the naturally occurring hormone somatostatin." Compl. ¶ 31. The FDA approved the drug in 2007 pursuant to section 505 of the FDCA. *Id.*; *see also* A.R. 342–71. The drug is currently licensed "for the treatment of patients suffering from acromegaly, a production of excess growth hormone (GH) by the pituitary gland, to treat adult patients with specific types of tumors in the gastrointestinal tract, and to help ease symptoms caused by carcinoid syndrome." Compl. ¶ 31.

Although the FDA initially approved Somatuline Depot as a drug, Ipsen argues that the substance also meets the recently-amended definition of "biological product." Compl. ¶¶ 33–35. More precisely, it argues that Somatuline Depot is a "protein" within the meaning of the PHSA—*i.e.*, an "alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size." 21 C.F.R. § 600.3(h)(6); *see also* Compl. ¶ 34 ("Somatuline Depot is[] an amino acid polymer with a specific defined sequence composed of multiple amino acid chains where the total number of amino acids exceeds 40 amino acids."). For that reason, Ipsen argues that the PHSA requires regulating Somatuline Depot as a "biological product." Compl. ¶ 46–60.

The FDA disagrees. The agency has not listed Somatuline Depot among the biological products now licensed under the PHSA. Compl. ¶¶ 40–41; *see also* FDA, *List of Approved NDAs for Biological Products That Were Deemed to be BLAs on March 23, 2020*, *supra*. And when Ipsen contacted the agency to argue that Somatuline Depot should be so listed, the agency rejected the company's position. *See* A.R. 2130–35 (concluding in an internal memo that Somatuline Depot is not a biological product); *id.* at 2644–58 (reaching the same conclusion in a letter to Ipsen after a telephonic hearing and the review of written submissions). In brief, the FDA reasoned that the proper frame of reference for applying its definition of "protein" is a drug's "active ingredient," as opposed to the drug in its entirety. *Id.* at 2133. Under that view, a

drug qualifies as a "protein" only if its active ingredient is an amino acid polymer composed of at least 40 amino acids. *See id.* Thus, because lanreotide acetate—the active ingredient of Somatuline Depot—contains only 8 amino acids, the FDA concluded that Somatuline Depot is not a protein. *See id.*

In this action, Ipsen argues that the FDA's failure to regulate to Somatuline Depot as a biological product violates the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* Compl. ¶¶ 65–74. Specifically, it argues that the agency's conduct is arbitrary, capricious, and contrary to law because Somatuline Depot meets the regulatory definition of a "protein." *See id.* As relevant here, Ipsen argues that the proper frame of reference for applying that definition is the "total number of amino acids in the finished dosage form of Somatuline Depot," *i.e.*, the "form" of Somatuline Depot that is "marketed and sold." Pl.'s Br. at 14–15. The company also argues that the FDA erred in considering "the structural and functional characteristics" of Somatuline Depot, despite disavowing any reliance on those factors in a prior rulemaking. *Id.* at 21–22. Finally, Ipsen argues that, even if Somatuline Deport is not a protein, it is at least "analogous" to a protein, which the company argues is sufficient for classification as a biological product. *Id.* at 24 (quoting 42 U.S.C. § 262(i)(1)).

## II.    LEGAL STANDARD

A court will grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A "material" fact is one with potential to change the substantive outcome of the litigation. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). And a

dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.

In cases arising under the Administrative Procedure Act, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). Accordingly, the Court will "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "unsupported by substantial evidence," *id.* § 706(2)(E). Before reviewing an agency action, however, this Court must first determine whether the party challenging that action has Article III standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).

## III.   ANALYSIS

Article III of the Constitution limits the "judicial Power" of federal courts to "Cases" and "Controversies," U.S. Const. art. III, § 2, cl. 1, and "there is no justiciable case or controversy unless the plaintiff has standing," *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017). To establish standing, Ipsen must demonstrate that it has suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted). It must also establish that there is "a causal connection between the injury and the conduct complained of" and that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* Each of these elements "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Id.* at 561. As such, at the

summary judgment stage, "the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (internal citations and quotation marks omitted).

In this action, Ipsen alleges two injuries-in-fact. First, it alleges that the regulation of Somatuline Depot as a drug rather than as a biological product exposes it to a greater risk of competition. Pl.'s Reply at 3–8, Dkt. 18. And second, it alleges that regulation under the FDCA entitles it to less information about potential patent infringement than would regulation under the PHSA, which hinders its ability to defend its manufacturing patents. *Id.* at 9–11. Both those injuries are too speculative to establish Article III standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10 (2013).

### A.      Ipsen Has Not Established A Competitive Injury

It is well-settled that "actual or imminent increase in competition" establishes an injury in fact. *Am. Inst. of Certified Pub. Accts. v. IRS*, 804 F.3d 1193, 1197 (D.C. Cir. 2015). Litigants accordingly suffer an injury in fact "when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them." *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (internal quotation marks and citation omitted). But an increase in competition establishes Article III standing only if it is "certainly impending," as opposed to speculative or remote. *Clapper*, 568 U.S. at 409; *see also New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002) (holding that agency action does not impose a competitive injury when it "is, at most, the first step in the direction of future competition"). Litigants thus lack standing when any increase in competition rests on a "highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410. Likewise, litigants are generally unable to establish competitive

standing based on the "independent action[s] of some third party not before the court." *See*, *e.g.*, *Florida Audubon Soc. v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996) (en banc).

Here, Ipsen alleges that the FDA's failure to regulate Somatuline Depot as a biological product "deprived [it] of the protections afforded by the approval pathway for biosimilars." Pl.'s Reply at 3, Dkt. 18. If the FDA regulated Somatuline Depot as a biological product, no company could market a generic version of it without successfully submitting an ABLA, which requires a showing of either biosimilarity or interchangeability. *See* 42 U.S.C. § 262(k). In contrast, because the FDA regulates Somatuline Depot as a drug, Ipsen's competitors may market generic versions of it upon successfully submitting an ANDA, which requires showing several forms of equivalence. *See* 21 U.S.C. § 355(j)(4). Ipsen argues that the showing required for ABLA approval is more demanding than that required for ANDA approval. Pl.'s Reply at 4–5. And as a result, Ipsen contends that the FDA's classification of Somatuline Depot as a drug removes a regulatory barrier to competition, thereby exposing it "lost sales in the marketplace," *id.* at 6.

This theory of standing rests on the "highly speculative fear" that: (1) at least one company will submit an ANDA to market a generic version of Somatuline Depot; (2) the FDA will approve at least one ANDA for that purpose; and (3) at least one generic approved through this process will satisfy the requirements of ANDA equivalence *but not* the more demanding requirements of ABLA biosimilarity. *Clapper*, 568 U.S. at 409–410. Each of these conditions must be satisfied for the classification of Somatuline Depot to cause a competitive injury. On the present record, the status of the first condition is uncertain, while those of the second and third are entirely speculative. Their combined "chain of possibilities" is thus too "attenuated" to establish Article III standing. *Id.* at 410.

    *1. Whether an ANDA has been filed*

  First, it is uncertain whether any company has applied or will apply to market a generic version of Somatuline Depot.  No company has announced its intention to do so.  *See* Defs.'s Br. at 14 & n.3, Dkt. 16-1; Pl.'s Reply at 6.  And the FDA may not "publicly disclose the existence of an . . . [ANDA] before an approval letter is sent to the applicant."  21 C.F.R. § 314.430(b).

  It is true that two companies have paid the fees required to list a Drug Master File (DMF) for lanreotide acetate, the active ingredient in Somatuline Depot, *see* FDA, *Type II Drug Master Files—Available for Reference List*, https://www.fda.gov/industry/generic-drug-user-fee-amendments/user-fee-lists (last accessed on August 23, 2021), and that DMFs provide confidential information about human drug products that could be referenced in a third party's ANDA, *see* Pl.'s Reply at 4 (citation omitted).  Even so, Ipsen has not shown that a third party has used or will use that information in an ANDA.  Although "DMF holders are required to pay [a DMF fee] 'when first authorizing the reference of their DMF in [an ANDA],'" *id.* at 7–8 (quoting FDA, *Completeness Assessments for Type II API DMFs Under GDUFA: Guidance for Industry* 1 & n.3 (Oct. 2017)), one of the DMF fees for lanreotide acetate was paid in December 2016, s*ee* FDA, *Type II Drug Master Files—Available for Reference List*, https://www.fda.gov/industry/ generic-drug-user-fee-amendments/user-fee-lists (last accessed on August 23, 2021).  The fact that no ANDA has been approved since then suggests that there is no clear link between such approval and the mere payment of a DMF fee.  And Ipsen has not provided enough information about the "economic logic" of the DMF regime for this Court to infer that link with the degree of confidence necessary at summary judgment.  *Sherley*, 610 F.3d at 72 (citation omitted); *see also Lujan*, 504 U.S. at 561 ("the plaintiff bears the burden of proof" to establish Article III standing).  Moreover, Ipsen's assertion that the payment of a DMF fee

foreshadows the filing of an ANDA appears in tension with the rule that the FDA does "not publicly disclose the existence" of ANDAs.  21 C.F.R. § 314.430(b).  Finally, although Ipsen separately notes that the "European Union currently has a generic of Ipsen's product under review," the conduct of an unknown party in a foreign jurisdiction hardly "presag[es]" how that party will proceed under the FDCA.  Pl.'s Reply. at 7.  For those reasons, it remains unclear whether a third party has submitted or will submit an ANDA for Somatuline Depot.

### 2.    *Whether the FDA will accept any ANDA it receives*

Second, even assuming that an ANDA has been submitted, it is speculative whether the FDA will approve it.  This Court has no way of knowing whether a hypothetical generic will be equivalent to Somatuline Depot in its active ingredient, conditions of use, route of administration, rate of absorption, dosage, and strength.  *See* 21 U.S.C. § 355(j)(4).  This is no small concern, as "[o]btaining approval for an ANDA is a demanding task, and approval is by no means a forgone conclusion."  *Teva Pharms. USA, Inc. v. Azar*, 369 F. Supp. 3d 183, 203 (D.D.C. 2019).  Indeed, this Court has previously noted that, "[w]ithout tentative approval as a signal or any other indication about the status of the FDA's review, the Court has *no means of assessing* whether any ANDA is likely to receive approval."  *Id.* (emphasis added).  *Teva* relied on this uncertainty to hold that a plaintiff lacked standing to challenge the approval of an ANDA before the FDA gave any indication that its approval was forthcoming.  *See id.* at 199–205.  Similarly here, the uncertainty inherent in the ANDA process prevents Ipsen from showing a competitive injury that is "certainly impending."  *Clapper*, 568 U.S. at 409.

Ipsen argues that *Teva* is inapposite because it is a "market exclusivity case" where "the sole focus of the challenge [was] the timing of a generic approval."  Pl.'s Reply at 8.  But *Teva* addressed the same question that is now before this Court—*i.e.*, whether uncertainty regarding

the approval of an ANDA is an obstacle to showing an injury-in-fact that is certain rather than

"speculative." *Teva*, 369 F. Supp. 3d. at 205.  Because *Teva* answered that question in the

affirmative, the decision cuts squarely against Ipsen's theory of standing, even though the

purported injury in *Teva* (a loss of market exclusively) differs from that here (the licensing of a

competitor).  Ipsen separately argues that *Teva* is distinguishable because it concerned "FDA

action or inaction with respect to *another entity's* product," whereas "Ipsen is challenging FDA

action directed at the classification of its *own* product."  Pl.'s Reply at 8.  But in determining

whether Ipsen faces an imminent competitive injury, the key question is how *the FDA* will

resolve any ANDA it receives.  Neither the identity of that application's sponsor nor Ipsen's

identity as the manufacturer of Somatuline Deport bears on that question.  Thus, there is no

material distinction, on the issue whether a purported injury is imminent, between *Teva* and this

case.

This approach to the imminence requirement is consistent with *Pfizer, Inc. v. Shalala*,

182 F.3d 975 (D.C. Cir. 1999).  In that case, a drug company challenged the FDA's decision to

"receive" a competitor's ANDA, on the theory that—due to an alleged difference between the

listed and generic drugs—the competitor was instead required to file an NDA.  *Id.* at 977–78.  At

that time, "receiving" an ANDA meant making "a threshold determination that the abbreviated

application [was] sufficiently complete to permit a substantive review."  21 C.F.R.

§ 314.101(b)(1) (1999).  Against that backdrop, *Pfizer* held that the company's challenge was

unripe because the FDA's receipt of an ANDA gave no indication of whether the agency would

accept it.  *Pfizer*, 182 F.3d at 978–79.  In explaining this holding, *Pfizer* emphasized that

receiving an ANDA is "merely the first step in the agency's approval process" and that "the FDA

may never approve [the competitor's] application."  *Id.* at 978.  That reasoning has force here

because, although *Pfizer* was a ripeness case, ripeness and standing are "related" doctrines that both derive from Article III. *Trump v. New York*, 141 S. Ct. 530, 535 (2020). As such, the fact that the D.C. Circuit found no ripeness in *Pfizer* (where the FDA had received an ANDA) strongly suggests that Ipsen lacks standing here (where the receipt of an ANDA is speculative).

The D.C. Circuit's later decision in *Teva Pharmaceuticals USA, Inc. v. Sebelius* (*Teva II*), 595 F.3d 1303 (D.C. Cir. 2010), is not to the contrary. In that case, a drug company alleged that an FDA policy would deprive it of a statutory right to market exclusivity, which the company could earn as the first entity to receive approval for a given generic. *See id.* at 1304–05, 1307–08 (referencing the grant of exclusivity in 21 U.S.C. § 355(j)(5)(B)(iv)). The D.C. Circuit held that the company had standing to challenge the FDA's policy, even though the agency had yet to formally approve the company's ANDAs. *See id.* at 1311–12. But in doing so, the circuit emphasized that the FDA "ha[d] awarded tentative approval" to those ANDAs, such that there was no "colorable factual dispute" on the agency's eventual decision. *Id.* at 1307, 1309; *see also id.* at 1312 (finding "no uncertainty to speak of on the matter"). *Teva II* thus differed from *Pfizer* in one crucial respect: in the former but not the latter, the approval of an ANDA was "certainly impending." *Clapper*, 568 U.S. at 409. Considering this difference, the Court reads *Teva II* to create an exception from *Pfizer*. Whereas *Pfizer* strongly suggested that plaintiffs may not establish Article III standing on grounds that presume the approval of an ANDA, *Teva II* held that plaintiffs may do so where the approval of an ANDA is practically certain. The instant case falls within *Pfizer*'s general rule, not *Teva II*'s exception, as there is no indication whether the FDA will ever approve an ANDA for Somatuline Depot.

In sum, this Court cannot predict whether the FDA will approve a competitor's ANDA for the active ingredient of Somatuline Depot. In similar circumstances, both this Court and the

D.C. Circuit have held that this uncertainty bars judicial review.  Accordingly, because Ipsen will

only suffer a competitive injury *if* the FDA approves an ANDA for Somatuline Depot, Ipsen

cannot establish an injury-in-fact that is "certainly impending."  *Clapper*, 568 U.S. at 409.

> 3.    *Whether any injury is fairly traceable to the FDA's classification*

Ipsen faces one further hurdle.  Even assuming that the FDA will approve an ANDA of

Somatuline Depot, it is entirely speculative whether the resulting increase in competition will be

"fairly traceable" to the classification of that substance as a drug rather than a biological product.

*Lujan*, 504 U.S. at 560 (ellipses and brackets omitted).  This hurdle concerns the differences

between ANDA equivalence and ABLA biosimilarity.

An ANDA requires showing several forms of equivalence, *see* 21 U.S.C. § 355(j)(4),

while an ABLA, at minimum, requires a showing of biosimilarity, *see* 42 U.S.C. § 262(k).[2]  If

the FDA approves a generic of Somatuline Depot that satisfies both the ANDA and ABLA

standards, there would be no "causal connection" between its current drug classification and any

increase in competition, as that same increase would have occurred even under Ipsen's preferred

biological product classification.  *Id.*  Thus, to show that the present classification of Somatuline

Depot as a drug presents an imminent competitive harm, Ipsen must show that the classification

will allow a competitor to market a product through the ANDA process that would otherwise fail

to receive FDA approval through the ABLA process.  *Cf. Clapper*, 568 U.S. at 410–11 (noting

that an injury from possible surveillance is not "fairly traceable to [50 U.S.C.] § 1881a" if it is

speculative "whether surveillance would be under § 1881a or some other authority").

---

[2] Though the FDA may approve an ABLA based on a showing of either a biosimilarity *or* interchangeability, the regulation defines "interchangeable" as "biosimilar" *and* "expected to produce the same clinical result" in any given patient.  *See* 42 U.S.C. § 262(k).  Thus, all ABLAs require a showing of biosimilarity.

Ipsen has not met that standard.  To begin, Ipsen has failed to show that the ABLA

biosimilarity requirements are more demanding than the ANDA equivalence requirements.  To

be sure, the requirements differ.  But it is far from clear that it is more difficult to show that two

products are "bioequivalent" and share the same active ingredient, conditions of use, route of

administration, dosage, and strength, 21 U.S.C. § 355(j)(4), than it is to show that they are

"highly similar" and lack any "clinically meaningful differences … in terms of [] safety, purity,

and potency," 42 U.S.C. § 262(i)(2)(B).  The requirements of the second showing are not a

logical subset of the first.  And aside from one conclusory sentence in a declaration, Ipsen has

provided no support for the proposition that the ABLA process is more rigorous than the ANDA

process.  *See* Avalos Decl. ¶ 6, Dkt. 18-1 ("The rigorous pathway for approval and substitution

of biosimilar products makes that pathway much less attractive to generic competitors."); *see*

*also Humane Soc'y of the United States v. Perdue*, 935 F.3d 598, 603 (D.C. Cir. 2019) ("[O]n

summary judgment, a party cannot establish standing with conclusory allegations of an

affidavit." (citation omitted)).  This Court is in no position to determine, solely from statutory

text, the relative difficulty of two scientific showings.[3]  Moreover, even assuming some drug

products meet the requirements of ANDA equivalence but not ABLA biosimilarity, it is

uncertain whether any generic of Somatuline Depot would fall in that category.

Ipsen is correct that the requirement for interchangeability is more demanding than

showing biosimilarity.  *See* 42 U.S.C. § 262(k)(4)(A) (providing that a biological product may

only be "interchangeable" if it is first "biosimilar").  Likewise, showing ABLA

---

[3] Ipsen argues that, unlike in an ABLA, the showing required in an ANDA is "made easier by access to Drug Master Files, which provide confidential detailed information about . . . human drug products" and may be referenced in a "third party's confidential FDA filing to satisfy approval."  Pl.'s Reply at 4, 5, Dkt. 18.  But Ipsen has made no attempt to show the materiality of this difference, *see Lujan*, 504 U.S. at 561.

interchangeability is more difficult than showing ANDA equivalence, *see* Pl.'s Reply at 5 (noting that, as of December 2020, the "FDA [had] not yet found any biosimilar product interchangeable"). This difference is significant, as a general matter, because "most jurisdictions do not permit pharmacists to substitute for biological products" without such a showing. *Id.* at 5. In contrast, "*any* generic drug . . . will [generally] qualify for substitution," and some states require "an FDA-approved generic to be substituted for a brand-name drug by the dispensing pharmacist, except in specific circumstances." *Id.* at 5–6. Even so, the heightened standard for a finding of interchangeability has no bearing on whether Ipsen faces an injury that is "certainly impending." *Clapper*, 568 U.S. at 409. It merely affects the *magnitude* of any injury that Ipsen could hypothetically suffer, which has no bearing on whether it has established Article III standing. *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an injury.").

Here, Ipsen will suffer an imminent injury only if a competitor submits an ANDA for Somatuline Depot, if the FDA approves that application, and if that approval is "fairly traceable" to the classification of Somatuline Depot. *Lujan*, 504 U.S. at 560 (ellipses and brackets omitted). To show that any approval is traceable in this respect, Ipsen must show that a competitor will meet the requirements of ANDA equivalence but not those of ABLA biosimilarity. Because the overlap between those standards is uncertain, and because this Court cannot determine how those standards will apply in a purely hypothetical case, Ipsen has failed to make that showing.

### 4.    *Ipsen's remaining arguments*

Ipsen's remaining arguments do not persuade. First, Ipsen argues that it will suffer a competitive injury before any ANDA is approved, as "[g]eneric manufacturers typically advise distributors of pending ANDA approvals in advance, and distributors start to reduce their

inventories of brand name drug products in advance of generic approval and launch."  Pl.'s

Reply at 6.  But Ipsen will suffer that injury only if the approval of an ANDA is certainly

impending.  *Clapper*, 568 U.S. at 409.  Second, Ipsen argues that it has standing under the

proposition that, "where . . . a statutory provision reflects a legislative purpose to protect a

competitive interest, the protected competitor has standing to require compliance with that

provision."  *Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1497 (D.C. Cir. 1996).  But that

proposition simply summarizes the doctrine of competitive standing, which also requires that a

plaintiff face an "actual or *imminent* increase in competition."  *Am. Inst. of Certified Pub. Accts.*,

804 F.3d at 1197 (emphasis added).  Finally, Ipsen argues that reaching the merits of this action

would have the "practical" benefit of resolving "significant uncertainties for all participants in

the marketplace."  Pl.'s Reply at 9.  But there is no "practical benefit" exception from Article III

standing.  A court may not exercise the "judicial power of the United States," U.S. Const. art. III,

§ 1, without satisfying the "irreducible constitutional minimum of standing," *Lujan*, 504 U.S. at

560, which includes an injury that is "certainly impending," *Clapper*, 568 U.S. at 409.  Nothing

in this opinion prevents Ipsen from challenging any ANDA that the FDA later approves.

　　　For the above reasons, Ipsen has failed to establish a competitive injury that is "certainly

impending."  *Clapper*, 568 U.S. at 409.  It has not shown (1) that a competitor has submitted an

ANDA for Somatuline Depot, (2) that the FDA will approve that application, and (3) that the

competitor's product would not have been approved under an ABLA.  Because each of those

showings is speculative in its own right, their combination is too "highly attenuated" to establish

a justiciable case or controversy.  *Id.* at 410.

### B.      Ipsen Has Not Established An Informational Injury

Ipsen separately argues that the classification of Somatuline Depot creates an informational injury.  It is well-established that the denial of information may create an injury in fact.  *See*, *e.g.*, *FEC v. Akins*, 524 U.S. 11 (1998); *Public Citizen v. DOJ*, 491 U.S. 440 (1989). The Supreme Court has clarified, however, that an "asserted informational injury that causes no adverse effects cannot satisfy Article III."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2214 (2021) (quoting *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020) (Katsas, J.)).  To establish an informational injury here, Ipsen must establish "downstream consequences" from its failing to receive the information in question.  *Id.*

Ipsen bases its alleged informational injury on the patent protections in the BPCIA.  By way of background, the sponsor of a biological product may hold patents "covering the [product itself], its therapeutic uses, and the processes used to manufacture it."  *Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1670 (2017).  To facilitate litigation over those patents, the BPCIA enables parties "to bring infringement actions at certain points in the [ABLA] process, even if the applicant has not yet committed an act that would traditionally constitute patent infringement." *Id.*  The BPCIA also "sets forth a carefully calibrated scheme for preparing to adjudicate, and then adjudicating," these actions."  *Id.*  As relevant here, this scheme mandates two disclosures from the ABLA applicant to the sponsor of the original biological product.  First, shortly after the FDA accepts an ABLA for review, the applicant must disclose both a copy of its application and "information that describes the process or processes used to manufacture" its product.  42 U.S.C. § 262(*l*)(2)(A).  And second, "not later than 180 days before the first commercial marketing" of that product, the applicant must submit a supplementary notice, *id.* § 262(*l*)(8)(A),

which allows the sponsor to seek to enjoin that marketing until a court resolves pending issues of "patent validity, enforcement, and infringement," *id.* § 262(*l*)(8)(B).

The FDCA also contains patent protections.  For example, it requires every ANDA applicant to certify, for each patent "which claims [either] the listed drug" or a use of that drug "for which the applicant is seeking approval," that the patent (I) has not been filed, (II) has or will soon expire, or (III) "is invalid or will not be infringed."  21 U.S.C. § 355(j)(2)(A)(vii).  The ANDA applicant must also provide notice of that certification to the patent's holder, *id.* § 355(j)(3), to facilitate any eventual litigation over infringement.  In this respect, there is some overlap between the patent protections afforded by the FDCA and those afforded by the BPCIA. But that overlap is incomplete.  Although the notice requirements in the BPCIA apply to patents that cover the manufacturing of biological products, *see* 42 U.S.C. § 262(*l*)(2)(A), the notice requirements in the FDCA do not apply to patents that cover the manufacturing of drugs, *see* 21 U.S.C. § 355(j)(2)(A)(vii).

Ipsen argues that the classification of Somatuline Depot as a drug rather than a biological product prevents it from adequately defending four patents it holds related to the manufacture of Somatuline Depot.  Pl.'s Reply at 10, Dkt. 18.  *See* Avalos Decl. ¶ 7, Dkt. 18-1 ("U.S. Patent Nos. 9,090,654 and 8,383,770 are directed to methods for manufacture of the active pharmaceutical ingredient, and U.S. Patent Nos. 9,352,012 and 10,206,968 are directed to methods for manufacturing the autogel drug product").  Specifically, Ipsen contends that the classification deprives it of the right to receive the disclosures provided under §§ 262(*l*)(2) and 262(*l*)(8) of the BPCIA.  But the loss of these statutory disclosures does not constitute a "concrete and particularized harm" necessary to establish an informational injury.  Pl.'s Reply at 10.

The Supreme Court's decision in *TransUnion* clarified that an informational injury may satisfy Article III only if it has "adverse effects" or "downstream consequences."  141 S. Ct. at 2214.  Under *TransUnion*, the fact that Ipsen will receive disclosures under the FDCA rather than under the BPCIA is too abstract to establish an injury in fact.[4]  *See id.*  To establish a concrete injury, Ipsen instead must show that the absence of any BPCIA disclosures will cause it some downstream harm—*e.g.*, by preventing it from adequately defending its manufacturing patents in the future.

Ipsen does not allege any downstream harm associated with the BPCIA disclosures, and even if it did, such an allegation would be too speculative to establish standing.  To show that the classification of Somatuline Depot would impair the defense of its manufacturing patents, Ipsen would need to demonstrate: (1) that at least one company will submit an ANDA to market a generic version of Somatuline Depot; (2) that the FDA will approve at least one ANDA for that purpose; and (3) that the generic will be manufactured in a manner that infringes one of Ipsen's patents. *Cf. Clapper*, 568 U.S. at 409–10.  This Court has already explained the difficulties with first and second inferences, and the record contains no information related to the third.  The combined chain of possibilities is thus too "highly attenuated" to establish Article III standing. *Id.*  As such, Ipsen has failed to establish standing based an informational injury.

---

[4] *TransUnion* suggested that the violation of "public-disclosure or sunshine laws that entitle all members of the public to certain information" is necessarily a justiciable injury.  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2214 (2021).  The BPCIA, which requires disclosures only to patent holders, is a not a public-disclosure law.

**CONCLUSION**

For the above reasons, this Court lacks subject-matter jurisdiction over Ipsen's complaint.

Accordingly, the defendants' Cross-Motion for Summary Judgment, Dkt. 16, is granted and the

plaintiff's Motion for Summary Judgment, Dkt. 11, is denied.  A separate order consistent with

this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

September 24, 2021